UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:

Mayco Plastics, Inc.,                                  Case No. 06-52727
                                                       Chapter 11
                        Debtor.                        Hon. Phillip J. Shefferly
_____/

Mayco Plastics, Inc.,

             Plaintiff,

vs.                                                    Adv. Proc. No.  07-5475

TRW Vehicle Safety Systems, Inc., Kelsey-Hayes
Company, a wholly owned subsidiary of TRW
Automotive Holdings Corp., TRW  Automotive
U.S., LLC, and TRW Safety Systems, Inc.,

             Defendants.
_____/

**OPINION GRANTING IN PART AND DENYING IN PART
PLAINTIFF'S AND DEFENDANTS'
MOTIONS FOR PARTIAL SUMMARY JUDGMENT**

I. Introduction

This opinion addresses cross motions for partial summary judgment filed in this adversary

proceeding.  For the reasons set forth in this opinion, the Court holds that the Plaintiff's motion for

partial summary judgment (docket entry #85) and the Defendants' motion for partial summary

judgment (docket entry #86) must each be granted in part and denied in part.

II. Jurisdiction

The Court has jurisdiction pursuant to 28 U.S.C. §§ 1334(a) and 157(a).  This is a core

proceeding under 28 U.S.C. § 157(b)(2)(B), (C), (D) and (O).

III. Facts

The documents, declarations and affidavits filed in support of the motions for partial

summary judgment show that there are no material facts in dispute between the Debtor and TRW with respect to the limited issues addressed by the cross motions for partial summary judgment.

On September 12, 2006, Mayco Plastics, Inc., the Debtor, filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. The Debtor was a designer, developer and manufacturer of high quality injection molded and painted components and assemblies used as original equipment components for various automobile manufacturers, including General Motors and DaimlerChrysler as well as for tier one suppliers, including TRW and Lear. The Debtor's customers used the components and assemblies in the production of passenger cars, light trucks, sport utility vehicles and mini vans.

For approximately ten years before the Debtor filed its Chapter 11 petition, TRW and certain of its affiliates (collectively referred to as "TRW") were customers of the Debtor. From time to time, TRW issued purchase orders to the Debtor for the manufacture and supply of component parts. In addition, TRW also issued separate purchase orders to the Debtor for the purchase of specialized tooling, molds, patterns, and equipment relating to the manufacture and supply of the component parts. In addition to the purchase orders issued by TRW to the Debtor, the relationship of the parties was governed by TRW's Automotive Terms and Conditions of Purchase.

Sometime toward the end of 2005, the Debtor began to experience financial difficulties. Like many automotive suppliers, the Debtor's business had suffered because of various factors including increases in the price of raw materials and the general decline in the domestic automotive market as a whole. By June, 2006, the Debtor had sought assistance from financial consultants. At the same time, the Debtor informed TRW of its financial difficulties. On June 12, 2006, TRW wrote to the Debtor requesting assurance that the Debtor would continue supplying parts to it without

-2-

interruption (docket entry # 98, Ex. 3). Following the advice of its financial consultants, the Debtor requested that its customers, including TRW, change their payment terms from 45 days to 14 days throughout the month of June. TRW agreed to do so. During June and July, 2006, The Debtor continued discussions with TRW and the Debtor's other customers regarding the Debtor's financial difficulties.

In July, 2006, the Debtor again requested a change in payment terms from its customers, including TRW. On July 18, 2006, TRW sent two letters to the Debtor (docket entry # 98, Ex. 3). In one of those letters, TRW rejected the Debtor's request for price increases and payment term changes. In the other letter, TRW requested that the Debtor, "under Uniform Commercial Code 2-609," provide TRW "in writing, adequate assurance of performance by close of business on July 21, 2006" with respect to the purchase orders issued by TRW to the Debtor. (Id.) On July 19, 2006, the Debtor responded by email informing TRW that the Debtor was "unable to provide [TRW] in writing of adequate assurance of performance" and further stating "unless the [sic] all major customers agree to the accelerated payment request we, in all likelihood, will not be able to continue our operations beyond this week." (Id.) Despite the Debtor's email on July 19, 2006, the Debtor continued to produce parts for TRW pursuant to TRW's purchase orders and TRW continued to accept them.

On July 20, 2006, the Debtor again requested accelerated payment terms from its customers, including TRW. TRW again agreed to advance payments to net 14 days. On July 25, 2006, the Debtor conducted a meeting with its major customers, including TRW, at which the Debtor circulated a summary of various accommodations that it was requesting from its customers. The summary of accommodations included shortened payment terms, price increases, and a provision

-3-

for an infusion of capital from an equity holder in the Debtor. TRW and the Debtor's other customers continued to provide accommodations after that meeting through August and the first part of September, 2006. Among other things, TRW advanced payments to the Debtor, purchased raw material for the Debtor, and purchased a subordinated participation in a loan made by the Debtor's lender at that time, PNC Bank, NA.

Despite the accommodations it had received from its customers, the Debtor's financial condition continued to deteriorate and, on September 12, 2006, the Debtor filed its Chapter 11 petition. According to the Debtor's complaint, at that time the outstanding balance owing by TRW to the Debtor, without any reductions for recoupments or set offs, was $4,066,207 for production of parts and $2,034,801 for tooling, for a total of $6,101,008. With one acknowledged set off, the net balance owed, as alleged by the Debtor, was $5,327,057.

On the same day that it filed its Chapter 11 petition, the Debtor also filed various first day motions, including a first day motion for entry of an interim order authorizing post-petition financing. On September 14, 2006, the Court held a hearing with respect to that motion. In its motion and at the hearing, the Debtor informed the Court that it had an urgent need for post-petition financing to continue to operate its business. The Debtor further informed the Court that continued production and operations were necessary to preserve the Debtor's business enterprise to enable it to proceed either to a sale or an orderly wind down, but in any event to maximize the value of the assets for the benefit of the estate. The Debtor requested that the Court enter an interim order authorizing it to obtain post-petition financing from Citizens Bank as a post-petition lender. The Debtor's motion also explained that to induce Citizens Bank to provide post-petition financing, certain of the Debtor's customers, including General Motors, DaimlerChrysler, TRW and Lear

-4-

("Participating Customers"), had agreed to provide the Debtor with accommodations and also to purchase from Citizens Bank subordinated participations in the post-petition loan to be made by Citizens Bank to the Debtor. The Debtor's first day motion sought authority for the Debtor to obtain a post-petition loan from Citizens Bank with a maximum working capital line of credit of $14,500,000, together with an out of formula advance up to $6,500,000. The motion requested authority to secure the post-petition loan by a lien on unencumbered property of the estate pursuant to § 364(c)(2) of the Bankruptcy Code and by a junior lien on encumbered property of the estate pursuant to § 364(c)(3) of the Bankruptcy Code. The Debtor's motion also requested that payment of the post-petition loan have a priority over the payment of all administrative expenses pursuant to § 364(c)(1) of the Bankruptcy Code.

After receiving an uncontested offer of proof from the Debtor at the hearing on September 14, 2006, the Court entered an interim order authorizing the Debtor to obtain the requested post-petition financing. The interim order scheduled a final hearing for October 19, 2006. After the entry of the interim order, certain modifications were made to it to resolve the objections of the Creditors' Committee. On October 17, 2006, the Debtor filed a stipulation signed by the Debtor, the Committee, Citizens Bank, the Participating Customers, the U.S. Trustee and the Debtor's pre-petition lender, PNC Bank. The stipulation requested that the Court enter a modified interim order authorizing post-petition financing. On October 17, 2006, the Court entered the modified interim order authorizing post-petition financing (docket entry #196 in the bankruptcy case). No timely objections were filed to the modified interim order becoming a final order. As a result, the modified interim order became a final order (hereafter referred to as "Financing Order") as of October 19, 2006.

Recital J of the Financing Order states that the Debtor requested Citizens Bank to provide the post-petition financing and that the Participating Customers agreed to "facilitate such financing" by providing certain credit enhancements and by purchasing participations in the post-petition loan from Citizens Bank. Recital N of the Financing Order states that Citizens Bank "is willing to provide Debtor with post-petition financing." Recital O states that "[t]o induce Lender to provide financing hereunder and in exchange for Debtor entering into the Access and Security Agreement," the Participating Customers agreed to provide certain "credit enhancements" and to purchase from Citizens Bank subordinated participations in its post-petition loan to the Debtor. Throughout the Financing Order, Citizens Bank is defined and referred to as the "Lender" and the payment obligations of the Debtor require that the Debtor pay Citizens Bank as the Lender. The Financing Order contains detailed, specific requirements regarding payment of the post-petition loan, the security for such payment, and the priority to be given to such payment. Paragraph 21 of the Financing Order authorizes and directs the Debtor to enter into an Access and Security Agreement in favor of each of the Participating Customers permitting the Participating Customers to have access to the Debtor's premises in certain circumstances and providing the Participating Customers with certain other rights relative to the Debtor.

On the same day that the Debtor filed its first day motion requesting entry of an interim order for post-petition financing, the Participating Customers entered into a Subordinated Participation Agreement ("SPA") with Citizens Bank (docket entry # 98, Ex. 6). Consistent with the Financing Order, the SPA states in recital D that the Participating Customers have "requested that Lender sell to the Participating Customers for cash and at par, undivided, last-out, fully subordinate interests in the Loan." Paragraph 1 of the SPA sets forth the agreement of Citizens Bank to sell to the

-6-

Participating Customers, and the agreement of the Participating Customers to purchase, the undivided, last-out, fully subordinate participations in Citizens Bank's post-petition loan to the Debtor, in accordance with a "Participation Percentage" among the Participating Customers. Paragraph 7 of the SPA provides that the Participating Customers "shall not be entitled to any monies received by Lender . . . <u>unless and until</u>" Citizens Bank has been paid in full by the Debtor for all principal, interest, costs and other expenses owed to Citizens Bank by the Debtor. Paragraph 7 goes on to provide that:

> Upon payment in full to Lender as provided in the immediately preceding sentence, Lender, may, at its sole option assign the Loan Documents . . . and all rights thereunder to BBK as agent for the Participating Customers in accordance with the Intercustomer Agreement . . . .

Paragraph 11 of the SPA explains that the Participating Customers are purchasing the participation "to assist [the Debtor] to maintain its supply of component parts to the Participating Customers." Paragraph 12 contains an acknowledgment by the Participating Customers that they had an opportunity to conduct a "review and investigation" sufficient to "make an independent and informed judgment" regarding the "credit worthiness of the [Debtor] and . . . the desirability of purchasing the Participations." Finally, paragraph 13 makes it clear that until Citizens Bank has been paid in full and has assigned the "Loan Documents" to BBK, as the agent for the Participating Customers in accordance with Paragraph 7, the

> Participating Customers will have no right to enforce any of the Loan Documents including, but not limited to, exercising any rights or remedies arising from the Loan Documents or any documents or agreements executed by [the Debtor] or provided for under applicable law. All rights, remedies, privileges, etc. with respect to the Advances and the Loan Documents may only be exercised by Lender without any requirement or consent or approval from the Participating Customers.

With the post-petition loan obtained by the Debtor from Citizens Bank, the Debtor continued

to operate its business in Chapter 11 and continued to provide component parts to its customers without interruption until the Debtor's business was sold as a going concern to NJT Enterprises, LLC. After selling the business, the Debtor continued as debtor in possession to liquidate its remaining assets, prosecute adversary proceedings and otherwise wind up the Chapter 11 case. The proceeds received by the Debtor from the sale of its business to NJT, together with the proceeds of the liquidation of any remaining assets in this estate, have been paid to Citizens Bank in accordance with the terms of the Financing Order, as well as to other properly perfected pre-petition secured creditors in accordance with their respective interests. Although Citizens Bank has been paid in full, the last out subordinated participations purchased by the Participating Customers from Citizens Bank have only been partially repaid. According to TRW, the amount of its "net loss" is approximately $1.6 million (docket entry #87 at p.6).

On May 14, 2007, the Debtor filed this adversary proceeding against TRW. The Debtor's second amended complaint (docket entry #68) contains three separate counts. Counts I and II relate to sums allegedly owing by TRW for the purchase of component parts by TRW from the Debtor. Count III relates to sums allegedly owing by TRW for the purchase of tooling by TRW from the Debtor. All of the counts relate to purchases that TRW made from the Debtor pre-petition. The Debtor seeks a judgment in the amount of $4,066,207 for the purchase of production parts and $2,034,801 for the purchase of tooling. The Debtor acknowledged TRW's right to a $773,950 set off for the tooling. With this acknowledged set off, the net amount of the judgment the Debtor requests is $5,327,057. On December 14, 2007, the Debtor filed a motion for partial summary judgment. The following day, TRW filed its own motion for partial summary judgment.

The Debtor's motion for partial summary judgment requests judgment in favor of the Debtor

on two issues.  First, the Debtor requests summary judgment with respect to affirmative defense M set forth in TRW's answer and affirmative defenses (docket entry #80) to the second amended complaint.  That affirmative defense states as follows:

> [The Debtor] anticipatorily repudiated the Production Purchase Orders and the Tooling Purchase Orders and the TRW Defendants' cover damages and other damages (together with their incidental and consequential damages) exceed the amounts [the Debtor] claims it is owed.

Second, the Debtor requests summary judgment with respect to TRW's affirmative defense P.  That affirmative defense states as follows:

> The TRW Defendants and certain of their affiliates are entitled to recoupments and/or setoffs, including, without limitation, those for overpayments, short shipments, goods that did not meet the TRW Defendants' quality standards, price variances, and others provided by the terms of the Production Purchase Orders and the Tooling Purchase Orders.

With respect to affirmative defense M, the Debtor rejects TRW's assertion that any unpaid balance owing to it on account of its participation in the Citizens Bank loan under the Financing Order somehow constitutes "cover" or damages for the Debtor's pre-petition repudiation of its purchase orders with TRW.  With respect to affirmative defense P, the Debtor acknowledges that TRW may have some recoupments or set offs that should be allowed, but not with respect to any unpaid balance owing to TRW on account of its participation in the Citizens Bank loan under the Financing Order and SPA.

TRW's motion for partial summary judgment requests summary judgment on four issues.  First, TRW requests that the Court find that there was an anticipatory repudiation by the Debtor of TRW's purchase orders in July, 2006.  Second, TRW requests that the Court find that the unpaid balance owing to it on account of its participation in the Citizens Bank loan constitutes "cover" under the Uniform Commercial Code or, alternatively, damages under the Uniform Commercial Code,

either of which is recoverable because of the Debtor's anticipatory repudiation. Third, TRW requests that the Court find that TRW is entitled to recoup any unpaid balance owing on its participation in the Citizens Bank loan against the pre-petition payable that it owes to the Debtor. Fourth, in the event that the Court finds that the doctrine of recoupment does not apply, that the Court instead find that TRW is entitled to set off the unpaid balance owing to it on its participation in the Citizens Bank loan against the balance owing by it on its pre-petition payable to the Debtor.

Although the issues framed by the Debtor in its motion for partial summary judgment and by TRW in its motion for partial summary judgment are stated somewhat differently, they are in substance essentially the same. The Debtor and TRW have filed extensive briefs and reply briefs and the Court heard oral argument on the motions on March 24, 2008.

## IV. Summary Judgment Standard

Fed. R. Civ. P. 56(c) for summary judgment is incorporated into Fed. R. Bankr. P. 7056. Summary judgment is only appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Id. at 247-48. A "genuine" issue is present "'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Berryman v. Reiger, 150 F.3d 561, 566 (6th Cir. 1998) (quoting Anderson, 447 U.S. at 248).

"The initial burden is on the moving party to demonstrate that an essential element of the non-moving party's case is lacking." Kalamazoo River Study Group v. Rockwell International Corp., 171 F.3d 1065, 1068 (6th Cir. 1999) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)). "The

-10-

burden then shifts to the non-moving party to come forward with specific facts, supported by evidence in the record, upon which a reasonable jury could return a verdict for the non-moving party." Id. (citing Anderson, 477 U.S. at 248). "The non-moving party, however, must provide more than mere allegations or denials . . . without giving any significant probative evidence to support" its position. Berryman v. Reiger, 150 F.3d at 566 (citing Anderson, 447 U.S. at 256).

## V. Discussion

1.      Prior to filing Chapter 11, did the Debtor repudiate TRW's purchase orders?

In affirmative defense M, TRW alleges that the Debtor "anticipatorily repudiated" TRW's purchase orders. TRW argues that the Debtor repudiated TRW's purchase orders on numerous occasions, including June 12 and 20 and July 17, 19, 20 and 25, 2006, when it advised TRW that it could not perform under TRW's purchase orders without receiving extraordinary accommodations from TRW and the Debtor's other customers. For support, TRW filed with its motion four declarations. Phil Roberts, a TRW director of global indirect purchasing, and Jim Zumstein, a BBK director, both signed declarations. Frank Gentile, a TRW director of global chemical commodity purchasing, signed a declaration and a supplemental declaration.

Attached to the declarations are copies of letters between TRW and the Debtor. Two communications are particularly important to TRW's repudiation claim (docket entry # 98, Ex. 3). The first is a July 18, 2006 letter from Phil Roberts to the Debtor that referred to the Debtor's own "concern" and "uncertainty" that the Debtor had expressed to TRW about its financial condition. The letter then went on to state that TRW "hereby requests, under Uniform Commercial Code 2-609 and other applicable law, that [the Debtor]  provide, in writing, adequate assurance of performance by close of business on July 21, 2006." The second letter is the reply that Phil Roberts received from

Dan Lickert, the Debtor's vice president of sales and marketing, to TRW's request for adequate assurance of performance. It is dated July 19, 2006 and it states that the Debtor "is unable to provide you in writing of adequate assurance of performance. Furthermore unless the [sic] all major customers agree to the accelerated payment request we, in all likelihood, will not be able to continue our operations beyond this week."

TRW argues that the Debtor's failure to provide adequate assurance of performance and its statement in Dan Lickert's letter of July 19, 2006, that it could not provide adequate assurance of performance constitute a repudiation of TRW's purchase orders.

The Debtor's brief in support of its motion for partial summary judgment (docket entry #85) states that the Debtor did not repudiate TRW's purchase orders but then goes on to say that this issue "is an admittedly fact-intensive determination for trial." The Debtor filed an affidavit from Robert Roberts, the Debtor's chief operating officer, in support of its motion and a supplemental affidavit of Robert Roberts in opposition to TRW's motion. These affidavits do not refute TRW's declarations by Gentile or Phil Roberts with respect to TRW's request for adequate assurance of performance and the Debtor's failure to provide adequate assurance of performance to TRW in June and July, 2006.

Mich. Comp. Laws Ann. § 440.2609(1) permits a buyer who believes that the performance of its seller is uncertain to request in writing assurance of performance rather than simply waiting to see if the seller performs under a contract for sale.

> A contract for sale imposes an obligation on each party that the other's expectation of receiving due performance will not be impaired. When reasonable grounds for insecurity arise with respect to the performance of either party the other may in writing demand adequate assurance of due performance and until he receives such assurance may if commercially reasonable suspend any performance for which he has not already received the agreed return.

Phil Roberts' July 18, 2006 letter requested that the Debtor provide, in writing, adequate

-12-

assurance of performance by the close of business on July 21, 2006. The email response he received from Dan Lickert on July 19, 2006, unequivocally states that the Debtor "is unable to provide you in writing of adequate assurance of performance." The Debtor does not refute this fact, nor does it contend that it ever subsequently provided written adequate assurance of performance to TRW in response to Phil Roberts' second letter of July 18, 2006, or that it ever retracted the statements in Dan Lickert's email.

Mich. Comp. Laws Ann. § 440.2609(4) provides the legal consequence that occurs when a seller of goods who has received a justified demand for written assurance of performance fails to provide such assurance: "After receipt of a justified demand failure to provide within a reasonable time not exceeding 30 days such assurance of due performance as is adequate under the circumstances of the particular case is a repudiation of the contract."

The Debtor's brief in opposition to TRW's motion for partial summary judgment (docket entry #97) states that "there is a factual dispute regarding repudiation" but offers no explanation as to what that factual issue is. At oral argument, the Court asked counsel for the Debtor if there were "any genuine issues of material fact on whether there was a repudiation of the contract." Counsel responded "I don't believe that there are, your honor. I believe that TRW has put forth facts that we cannot materially dispute."

TRW's declarations and the Debtor's own affidavits show that TRW had reasonable grounds for insecurity with respect to the Debtor's ability to perform under the TRW purchase orders based upon the financial circumstances described by the Debtor to TRW, and that TRW was justified in demanding that the Debtor provide it with adequate assurance of performance. The Debtor not only declined to provide TRW with such adequate assurance, but specifically replied that it could not

provide any such assurance. There are no genuine issues of material fact regarding whether TRW had reasonable grounds for insecurity, whether it made a demand for assurance, whether it was justified in making the demand, or whether the Debtor provided adequate assurance of performance. Therefore, the Court holds that there was a repudiation of the TRW purchase orders by the Debtor.

       2.    <u>What were TRW's remedies upon the Debtor's repudiation of TRW's purchase orders?</u>

Mich. Comp. Laws Ann. § 440.2610 provides remedies for an aggrieved party where the other party to a contract has repudiated it.

> When either party repudiates the contract with respect to a performance not yet due the loss of which will substantially impair the value of the contract to the other, the aggrieved party may
>
> (a)    for a commercially reasonable time await performance by the repudiating party; or
> (b)    resort to any remedy for breach (section 2703 or section 2711), even though he has notified the repudiating party that he would await the latter's performance and has urged retraction; and
> (c)    in either case suspend his own performance or proceed in accordance with the provisions of this article on the seller's right to identify goods to the contract notwithstanding breach or to salvage unfinished goods (section 2704).

Upon the Debtor's repudiation of TRW's purchase orders, TRW was entitled to await performance by the Debtor or resort to any remedy for breach, and in either case suspend its own performance.

Mich. Comp. Laws Ann. § 440.2711(1) provides that a party that elects to resort to a remedy for breach may, among other things, "cover" or recover damages for non-delivery.

> Where the seller . . . repudiates . . . then with respect to any goods involved, . . . the buyer may cancel and whether or not he has done so may in addition to recovering so much of the price as has been paid
>
> (a)    "cover" and have damages under the next section as to all the goods affected whether or not they have been identified to the contract; or
> (b)    recover damages for nondelivery as provided in this article (section 2713).

-14-

The remedy of "cover" is provided by Mich. Comp. Laws Ann. § 440.2712, which reads as follows:

(1)     After a breach within the preceding section the buyer may "cover" by making in good faith and without unreasonable delay any reasonable purchase of or contract to purchase goods in substitution for those due from the seller.

(2)     The buyer may recover from the seller as damages the difference between the cost of cover and the contract price together with any incidental or consequential damages as hereinafter defined (section 2715), but less expenses saved in consequence of the seller's breach.

(3)     Failure of the buyer to effect cover within this section does not bar him from any other remedy.

This section permits an aggrieved buyer, upon the seller's repudiation, to obtain the goods it needs in substitution for the affected goods due from the seller. The section further permits the aggrieved buyer to then recover as damages any difference between the cost of cover and the contract price of the goods together with incidental or consequential damages.

Finally, if an aggrieved buyer does not cover upon repudiation by a seller of goods, the aggrieved buyer still has a remedy for damages available under Mich. Comp. Laws Ann. § 440.2713.

(1)     Subject to the provisions of this article with respect to proof of market price (section 2723), the measure of damages for nondelivery or repudiation by the seller is the difference between the market price at the time when the buyer learned of the breach and the contract price together with any incidental and consequential damages provided in this article (section 2715), but less expenses saved in  consequence of the seller's breach.

(2)     Market price is to be determined as of the place for tender or, in cases of rejection after arrival or revocation of acceptance, as of the place of arrival.

Mich. Comp. Laws Ann. § 440.2715 defines incidental and consequential damages.

(1)     Incidental damages resulting from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach.

(2)     Consequential damages resulting from the seller's breach include (a) any loss resulting from general or particular requirements and needs of which the seller

-15-

at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and (b) injury to person or property proximately resulting from any breach of warranty.

In sum, once the Debtor repudiated its contract with TRW, TRW had several remedies available to it under the Michigan Uniform Commercial Code, including cover or damages for non-delivery, either of which would still permit TRW to recover incidental and consequential damages. Moreover, to the extent that TRW was entitled to such remedies, TRW's Automotive Terms and Conditions of Purchase contained a provision that expressly allowed it to net any amounts that it was owed by the Debtor against the payable owing by TRW to the Debtor (docket entry # 87, Ex. C). Paragraph 21 of the Terms and Conditions provides:

> Setoff: In addition to any right of setoff or recruitment provided by law, all amounts due to Seller shall be considered net of indebtedness or obligations of Seller and its affiliates/subsidiaries to [TRW] and its affiliates/subsidiaries and [TRW] shall have the right to set off against or to recoup from any amounts due to Seller and its affiliates/subsidiaries from [TRW] and its affiliates/subsidiaries.

Thus, to the extent that TRW was entitled to any damages under the applicable provisions of the Uniform Commercial Code cited above because of the Debtor's repudiation of the TRW purchase orders, TRW was permitted under paragraph 21 of the Terms and Conditions to net those recoveries against the payable that it owed to the Debtor for parts and tooling.

3.  Does TRW's purchase of a participation in the post-petition loan made by Citizens Bank to the Debtor under the Financing Order constitute cover or a measure of damages for the pre-petition repudiation by the Debtor of the TRW purchase orders?

As noted above, under the Michigan Uniform Commercial Code, "cover" is the good faith purchase, without unreasonable delay, of substitute goods. Mich. Comp. Laws Ann. § 440.2712(1). The amount of damages is measured as the difference between the cost of the substitute goods and the contract price, plus incidental and consequential damages, "but less expenses saved" by the buyer.

-16-

Id. § 440.2712(2). Accordingly, cover is not intended to leave a buyer in a better position. 24 Williston on Contracts § 66:44 (4th ed. 2007) (footnote omitted). Cover recognizes the limitation of damages in the commercial contract situation, see Kewin v. Massachusetts Mutual Life Insurance Co., 295 N.W.2d 50, 53 (Mich. 1980), and furthers the aim of certainty in their calculation.

TRW first argues that its purchase of a participation in the post-petition loan made by Citizens Bank was a form of cover. The Debtor argues that TRW's purchase of a participation in the post-petition loan was not a form of cover because even after the Debtor repudiated TRW's purchase orders, it continued to supply parts to TRW and TRW continued to accept them. According to the Debtor, any funds ultimately provided by TRW to the Debtor post-petition under the SPA do not constitute the purchase of substitute goods necessitated by the Debtor's pre-petition repudiation but instead were funds paid by TRW to Citizens Bank solely to purchase a participation in the post-petition loan made by Citizens Bank to the Debtor. TRW counters that despite the form of the transaction, the Court should look to the substance of the SPA transaction, which TRW characterizes as a means of enabling it to purchase substitute goods and thereby constitutes a form of cover.

TRW discusses two cases in its brief, in urging the Court to look to the substance, and not necessarily the form, of the transaction. In Kelsey-Hayes Co. v. Galtaco Redlaw Castings Corp., 749 F. Supp. 794 (E.D. Mich. 1990), the plaintiff agreed to the breaching defendant's demand for price increases that were contrary to the existing fixed-price long term contracts. The plaintiff did so because there was no replacement supplier immediately available. In dictum, the court noted that the plaintiff had "a viable cause of action" for cover under the Michigan Uniform Commercial Code even though it covered by purchasing goods from the breaching seller instead of from a third party. 749 F. Supp. at 799 n.10. In the second case relied on by TRW, Teeman v. Jurek, 251 N.W.2d 698

(Minn. 1977), the court measured damages based on the amount that the buyer paid to his customer after the seller breached. Although not "cover" under the Minnesota Uniform Commercial Code, the court found the amount "did represent the difference between the cost of cover and the contract price," and concluded that the amount was reasonable under the Minnesota statute. 251 N.W. 2d at 702-03.

While the parties differ in their characterization of TRW's purchase of a subordinated participation from Citizens Bank, there is no issue of fact regarding what documents memorialize that participation or what they say. There are two operative documents, the Financing Order and the SPA. The Financing Order (docket entry # 196 in the bankruptcy case) describes the post-petition loan that the Debtor sought to obtain from Citizens Bank as consisting of a revolving working capital line of credit up to a maximum of $14,500,000 and an out of formula advance up to $6,500,000 (recital P). Recitals J and K in the Financing Order make it clear that the purpose of the post-petition financing was to enable the Debtor to meet its payroll, purchase raw materials, and otherwise fund its day to day operations and working capital requirements as well as pay for the professional fees incurred by the Debtor in its Chapter 11 case. The recitals in the Financing Order confirm that the loan proceeds were intended to be used for all of the Debtor's post-petition business operations and that the amount of the requested loan was determined by reference to all of the Debtor's post-petition business operations, including the manufacture and sale of parts to all of its customers. There is no indication in the Financing Order that the amount of the post-petition loan by Citizens Bank was determined by reference to the cost for TRW to cover by purchasing substitute goods from the Debtor because of the Debtor's pre-petition repudiation of TRW's purchase orders, nor is there any such restriction in the Financing Order on the use of the loan proceeds. The Financing Order simply does not refer

-18-

either explicitly or implicitly to the purchase of any goods by TRW by way of cover or in substitution for goods that were not delivered to it because of the Debtor's pre-petition repudiation of TRW's purchase orders.

Nor does the SPA (docket entry # 98, Ex. 6) reflect that it is a form of cover. Like the Financing Order, the SPA defines Citizens Bank as "Lender." Recital B of the SPA states that the Debtor "requested that Lender provide debtor-in-possession financing." Recital D states that "[t]he Participating Customers have also requested that Lender sell to the Participating Customers for cash and at par, undivided, last-out, fully subordinate interests in the Loans." The recitals say nothing about the Participating Customers, including TRW, purchasing any participations to somehow enable them to cover as a result of any pre-petition breach by the Debtor of its contracts with such customers. Paragraph 1 of the SPA states that the amounts of the participations are determined by a "Participation Percentage" among the Participating Customers and says nothing about calculating the amounts of the participations by reference to any cover by any of the Participating Customers. Further, paragraph 3 of the SPA provides a mechanism for Citizens Bank to request additional participation purchases to fund the Debtor with "Overformula Advances." Again, the amounts of the "Overformula Advances" to be purchased by Participating Customers are not stated by reference to any Participating Customer's purchase of substitute goods by way of cover on account of any pre-petition repudiation of purchase orders by the Debtor. The SPA is simply devoid of any recitals or provisions that tend in any way to show that TRW's purchase of a participation under the SPA was for the purchase of substitute goods or otherwise a form of cover because of the Debtor's pre-petition repudiation of the TRW purchase orders.

Not only do the Financing Order and the SPA not contain any recitals or provisions that

support TRW's contention that its purchase of a participation was cover, but instead they demonstrate that the Participating Customers, including TRW, were receiving various other rights and benefits from executing the SPA that had nothing to do with the purchase of substitute goods on account of any pre-petition repudiation by the Debtor. Paragraph 21 of the Financing Order (docket entry #196 in the bankruptcy case) states that the Debtor was authorized and directed to execute and deliver to the Participating Customers an Access and Security Agreement. The Access and Security Agreement conferred upon the Participating Customers the right to enter the Debtor's premises as well as various other rights. Paragraph 23 of the Financing Order required the Debtor to "build an inventory bank of Component Parts for each Participating Customer" that is "[i]n addition to the manufacturing of each Participating Customer's regular production requirements in accordance with releases issued under the applicable Purchase Orders." Paragraph 24 of the Financing Order granted each Participating Customer a right to resource its business on seven days notice. Paragraph 25 of the Financing Order granted each of the Participating Customers an acknowledgment of the ownership of certain tooling and a right of immediate possession of such tooling. In short, TRW bargained for and received various rights and benefits under the Financing Order and the SPA that extend far beyond the purchase of goods in substitution for goods affected by any pre-petition repudiation by the Debtor. The rights bargained for and gained by TRW and the other Participating Customers under the Financing Order and the SPA go far beyond the concept of cover.

The declarations submitted by TRW in support of its motion for partial summary judgment also do not support its request that the Court now retroactively view its purchase of a participation as a form of cover. The only mention of the Financing Order or the SPA in Gentile's first declaration is in paragraph 10 in which he states that TRW provided credit enhancements and necessary

-20-

operating cash to the Debtor by entering into the SPA. Gentile's supplemental declaration does not refer at all to the Financing Order or the SPA. Phil Roberts' declaration does not refer at all to the Financing Order or the SPA. Nor is there anything in Zumstein's declaration that supports TRW's contention that its purchase of a participation under the Financing Order and the SPA should somehow be construed as cover for the Debtor's pre-petition repudiation of TRW's purchase orders.

The Court holds that there are no genuine issues of material fact relative to TRW's claim that the amount it paid under the Financing Order and the SPA somehow constitutes cover. The Court concludes as a matter of law that the amount paid by TRW for its participation in Citizens Bank's post-petition loan under the Financing Order and the SPA is not cover within the meaning of Mich. Comp. Laws Ann. § 440.2711. Because the Court has concluded that TRW's purchase of a participation in the post-petition loan is not cover, the Court need not address the Debtor's additional argument that cover damages are not available to TRW because it is a buyer who has accepted the goods.

In the alternative, TRW argues that if the funds paid by it for the loan participation under the Financing Order and the SPA do not constitute cover, they nonetheless are still a form of damages for the Debtor's pre-petition repudiation and that such damages are recoverable as incidental or consequential damages under Mich. Comp. Laws Ann. § 440.2711(b) and §§ 440.2713 and 440.2715. The Debtor argues that the funds paid by TRW for its post-petition loan participation are not damages at all but instead represent merely the purchase of an interest in a post-petition loan.

Section 440.2713(1) defines damages for breach by a repudiating seller as the difference between the market price and the contract price, plus incidental and consequential damages, which in turn are defined in § 440.2715. Incidental damages include reasonable expenses incurred in the

-21-

"care and custody" of rightfully rejected goods, commercially reasonable expenses incurred in connection with effecting cover, and other reasonable expenses incident to the breach. Mich. Comp. Laws Ann. § 440.2715(1). Consequential damages include "any loss resulting from general or particular requirements and needs" that the seller "had reason to know and which could not reasonably be prevented by cover or otherwise." Id. § 440.2715(2)(a).

The Court agrees with the Debtor that there is nothing in the record before the Court upon which a reasonable jury could find that the amount paid by TRW under the Financing Order and the SPA constitutes a measure of incidental or consequential damages occasioned by a pre-petition repudiation by the Debtor. As explained in the discussion about cover above, the Financing Order and the SPA do not themselves in any way, either explicitly or implicitly, describe the post-petition financing transaction as anything other than a post-petition loan. They do not attempt in any way to connect the amount of the post-petition loan to any damages suffered by TRW on account of any pre-petition breach by the Debtor. The amount of the post-petition loan was stated, requested and approved in the Financing Order by reference to the cash needs for all of the Debtor's post-petition business operations, including the production of parts for other customers as well as TRW, payment of general and administrative expenses, payment of professional fees and payment of any other post-petition working capital needs. There is nothing in the record that shows that the amount of the post-petition loan made and authorized by the Financing Order bears any relationship to the amount of any damages allegedly suffered by TRW on account of any pre-petition repudiation by the Debtor. The SPA and the Financing Order do not attempt to connect even the amount of TRW's participation to any incidental or consequential damages it may have suffered as a result of any pre-petition repudiation by the Debtor. Nor do any of the declarations filed by TRW in support of its request for

-22-

partial summary judgment provide that either the amount of the post-petition loan or TRW's participation in it, were in any way calculated based on any pre-petition, incidental or consequential damages TRW may have suffered.

TRW purchased a participation in a post-petition loan made by Citizens Bank to the Debtor under the Financing Order. All of the documents describe the relationship as a post-petition loan made by Citizens Bank with a participation in it by TRW under the SPA. TRW's after the fact quest to recharacterize its participation in this post-petition loan as somehow measuring its damages for a pre-petition repudiation is simply not supported by either the documents or the declarations filed by TRW. The fact that there was a pre-petition repudiation by the Debtor may help explain *why* TRW chose to enter into a post-petition participation with Citizens Bank. But it does not necessarily follow that either the amount of Citizens Bank's post-petition loan or the amount of TRW's participation in it themselves represent a liquidation or measurement of damages suffered by TRW on account of the Debtor's pre-petition repudiation. That is just not what is reflected in the documents nor in any of the declarations filed by TRW. The Court is not persuaded that the post-petition loan participation purchased by TRW from Citizens Bank can be viewed as somehow measuring TRW's pre-petition damages caused by the Debtor's pre-petition repudiation.

The Court concludes there are no genuine issues of material fact and that, as a matter of law, the amount paid by TRW under the SPA for its participation in the Citizens Bank post-petition loan under the Financing Order is neither cover under Mich. Comp. Laws Ann. § 440.2711, nor damages under Mich. Comp. Laws Ann. § 440.2713, on account of the Debtor's pre-petition repudiation of TRW's purchase orders. This holding does not preclude TRW from asserting that the Debtor's pre-petition repudiation did cause it to incur cover or other damages, but only adjudicates that the unpaid

-23-

balance owing with respect to TRW's post-petition loan participation is neither cover nor damages on account of the Debtor's pre-petition repudiation of the TRW purchase orders.

4.  Is TRW entitled to reduce the unpaid balance on its pre-petition payable owing to the Debtor by the unpaid balance on its post-petition loan participation under the doctrine of recoupment?

Even if the unpaid balance owing on its post-petition loan participation does not constitute cover or damages caused by the Debtor's pre-petition repudiation of the TRW purchase orders, nonetheless, TRW asserts that it may reduce the pre-petition payable that it owes to the Debtor by the amount owed to it on its loan participation under the SPA and the Financing Order by way of recoupment. In addition to asserting rights under the doctrine of recoupment, TRW also points out that section 21 of the Terms and Conditions of its purchase orders recognizes TRW's right of recoupment.

The doctrine of recoupment allows one party to deduct monies owed to it by another party, from monies owed by it to the other party, as long as the two obligations arise out of the same contract or transaction. See Mudge v. Macomb County, 580 N.W.2d 845, 855 (Mich. 1998). Recoupment is different than set off. Unlike set off, which may apply to reduce or extinguish mutual debts arising from different transactions, recoupment applies only when the debts arise from the same transaction.

> "[Recoupment] is applied when there are countervailing claims arising from the same transaction strictly for the purpose of abatement or reduction . . . [and] provides for the adjudication of the just apportionment of liability relative to a dispute regarding a singular transaction.
>
> "Because recoupment only reduces a debt as opposed to constituting an independent basis for a debt, it is not a claim in bankruptcy, and is therefore unaffected by the debtor's discharge."

In re Delicruz, 300 B.R. 669, 680 (Bankr. E.D. Mich. 2003) (quoting Oregon v. Harmon (In re

Harmon), 188 B.R. 421, 425 (9th Cir. B.A.P. 1995)). "The principle of recoupment presents an affirmative defense . . . . The burden of proof on matters raised in the use of recoupment is on the [party] who raises them." Id. (internal quotation marks and citation omitted).

> The defense of recoupment refers to a defendant's right, in the same action, to cut down the plaintiff's demand, either because the plaintiff has not complied with some cross obligation of the contract on which he or she sues or because the plaintiff has violated some legal duty in the making or performance of that contract. Recoupment is a doctrine of an intrinsically defensive nature founded upon an equitable reason, inhering in the same transaction, why the plaintiff's claim in equity and good conscience should be reduced.

Mudge v. Macomb County, 580 N.W.2d at 855 (internal quotation marks and citations omitted). A defendant's right to recoup "must grow out of the same transaction which furnishes the plaintiff's cause of action, . . . [and] exists as long as the plaintiff's cause of action exists . . . ." City of Grand Rapids, Michigan v. McCurdy, 136 F.2d 615, 619 (6th Cir. 1943) (applying Michigan law).

TRW contends that the "countervailing claims" in this case "arise from the same transaction – indeed, the same contracts." On one hand, the Debtor's claim for payment from TRW arose from the pre-petition purchase orders. On the other hand, according to TRW, TRW's post-petition injection of cash through the Financing Order and the SPA allowed the Debtor to perform under TRW's purchase orders. Thus, TRW reasons that the unpaid balance owed to it on its post-petition loan participation arose from the same transaction as the pre-petition purchase orders that the Debtor repudiated.

The Debtor argues that the post-petition loan and TRW's participation in it under the Financing Order and the SPA are not part of the same transaction as the pre-petition purchase of parts and tooling by TRW from the Debtor under the TRW purchase orders. As a result, the Debtor argues that recoupment is not applicable whether under the case law that has developed or the contractual

-25-

provision in section 21 of the Terms and Conditions of TRW's purchase orders.

The Court agrees with the Debtor. First, the post-petition loan made by Citizens Bank to the Debtor cannot itself be said to be part of the same transaction as the pre-petition purchase orders issued by TRW to the Debtor for parts and tooling. TRW has not directed the Court's attention to any provision in TRW's purchase orders or its standard Terms and Conditions that in any way either addresses or even contemplates a relationship between TRW and a third party that is providing a loan to the Debtor. The loan made by Citizens Bank was not defined by or limited to the cost of production of parts or tooling by the Debtor for TRW. It was a loan made for all of the Debtor's post-petition working capital needs in connection with the operation of its entire business. Further, Citizens Bank was not a lender for the Debtor at any time pre-petition when TRW issued the purchase orders. Nor was it a lender for the Debtor at the time that the Debtor repudiated the TRW purchase orders. The loan transaction between the Debtor and Citizens Bank did not occur until after the Chapter 11 case was filed, long after the execution of the TRW purchase orders and the repudiation of those purchase orders by the Debtor. Nothing in the record supports the proposition that the post-petition loan made by Citizens Bank to the Debtor was part of the same transaction as the TRW purchase orders issued by TRW to the Debtor pre-petition.

Second, the purchase by TRW of a participation in the Citizens Bank post-petition loan is even further removed from the transaction consisting of the pre-petition purchase orders issued by TRW to the Debtor. TRW itself did not make a loan to the Debtor. Instead, it purchased a participation in a post-petition loan made by someone else, Citizens Bank. Further, like the Citizens Bank post-petition loan, the SPA did not occur until after the Debtor filed its Chapter 11 case. Not only did the Debtor have no relationship with Citizens Bank when TRW issued the purchase orders,

-26-

but TRW also had no relationship with Citizens Bank at that time. The transaction between Citizens Bank and TRW that is memorialized in the SPA was made long after the TRW purchase orders had been issued to the Debtor pre-petition and were repudiated by the Debtor pre-petition. There is nothing in the Financing Order or the SPA that supports TRW's contention that the post-petition loan and the SPA are part of the same transaction as the pre-petition TRW purchase orders with the Debtor. Nor has TRW submitted any declarations to support this contention.

In support of its argument, TRW relies in part on Harris v. Dial Corp., 954 F.2d 990 (4th Cir. 1992). In this case, Dial issued a purchase order to Brewster Plastics under which Brewster was to supply Dial with plastic bottles. 954 F.2d at 991. Brewster was unable to purchase resin for the bottles. However, Dial had an available source of its own. The parties "executed a change order as an addendum to the purchase order," providing for "both the manufacture of bottles and the supply of resin." Id. The court held "that there was one contract covering both the resin and the bottles." Id. at 993. Both agreements were memorialized in the change order. The resin agreement was "inseparably intertwined" with "the bottle agreement because Brewster could not have made the bottles without the resin, and it could not get the resin except from Dial." Id.

This case does not help TRW. Applying the "same transaction" test from Harris v. Dial, TRW's purchase of a participation in a post-petition loan from Citizens Bank, that was made for the purpose of funding all of the Debtor's business operations, was not "inseparably intertwined" with the purchase orders issued by TRW to the Debtor pre-petition. TRW's advancement of funds through its purchase of a subordinated participation may have assisted the Debtor in having working capital to perform under the TRW purchase orders in addition to making parts for its other customers and paying for the other operating expenses of its business. That does not mean that the SPA was

-27-

somehow incorporated into or intertwined with the purchase orders.

The transparency of the transaction between the buyer and seller in <u>Harris v. Dial</u> contrasts with this case and highlights the fact that here, no other party viewed the SPA as TRW now urges the Court to do, i.e. that TRW was paying for parts and tooling purchased pre-petition through its purchase of a participation in the post-petition loan. TRW's attempt to recast the post-petition loan of Citizens Bank and its own participation in that loan as part of the same transaction as the pre-petition purchase orders between TRW and the Debtor is creative, but it is unsupported. The Citizens Bank post-petition loan under the Financing Order and TRW's purchase of a participation in it through the SPA are simply different transactions than the pre-petition purchase orders issued by TRW to the Debtor.

There are no genuine issues of material fact with respect to this issue. The Court concludes that TRW's pre-petition purchase orders and TRW's purchase of a participation in a post-petition loan are not part of the same transaction. Therefore, TRW may not recoup any unpaid balance owing to it under the SPA against the pre-petition payable that it owes to the Debtor under the common law doctrine of recoupment. Because the doctrine of recoupment is not applicable, the preservation of any recoupment rights in section 21 of TRW's Terms and Conditions does not help TRS. Due to the limited nature of the relief sought in the cross motions for summary judgment, this opinion does not address TRW's rights, if any, to recoup any *other* loss it may have against the pre-petition debt owed by TRW to the Debtor.

5.      <u>Does § 553 of the Bankruptcy Code permit TRW to set off the unpaid balance owing on its post-petition loan participation against the pre-petition payable that it owes the Debtor?</u>

TRW next argues that even if it is not entitled to recoup the unpaid balance on the SPA, it is

-28-

still entitled to set off that unpaid balance against the pre-petition payable that it owes to the Debtor.

Section 553 of the Bankruptcy Code preserves the right to set off as a widely recognized common law right that "allows entities that owe each other money to apply their mutual debts against each other, thereby avoiding the absurdity of making A pay B when B owes A." Citizens Bank of Maryland v. Strumpf, 516 U.S. 16, 18 (1995) (internal quotation marks and citation omitted). Section 553(a) of the Bankruptcy Code preserves the right to set off pre-petition debts and pre-petition claims with certain limitations.

> Except as otherwise provided in this section and in sections 362 and 363 of this title, this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case[.]

Section 553 does not create a right of set off but only preserves a right of set off to the extent that it may otherwise exist under non-bankruptcy law. "State law governs the substance of a set off claim under § 553." In re New Haven Foundry, Inc., 285 B.R. 646, 648 (Bankr. E.D. Mich. 2002) (citation omitted). The New Haven Foundry case dealt with a right of set off under Michigan law.

> Generally, the setoff and the action must be between the same parties and in the same capacity or right, and the court can look through the transactions and nominal parties to determine the real parties in interest. A setoff requires a mutuality of debt between the same real parties in interest, where the demands of the mutually indebted parties are set off against each other and only the balance recovered. However, setoff rests on opposing claims that are enforceable in their own right. A claim for setoff need not arise out of the same transaction as that sued on. If the parties are mutually indebted, there may be a setoff regardless of whether the debt arises out of the same contract or transaction.

Id. (internal quotation marks and citation omitted).

Because § 553 only preserves rights of set off with respect to pre-petition debts and pre-petition claims, the starting point to determine whether § 553 applies to TRW's alleged right of set

-29-

off is to determine whether TRW seeks to set off a pre-petition debt against a pre-petition claim. There is no question that TRW's payable for the purchase of parts and tools in the net amount of $5,327,057 is a pre-petition debt owing by TRW to the Debtor. TRW also asserts that the unpaid balance owing to it under the SPA is a pre-petition claim against the Debtor. Although TRW acknowledges that the Financing Order and the SPA were executed by it after the Debtor filed its Chapter 11 petition, TRW nonetheless argues that in substance the unpaid balance owing to it under the SPA is a pre-petition claim for damages against the Debtor that arose when the Debtor repudiated the TRW purchase orders pre-petition. TRW contends that its participation in the Citizens Bank loan, although made post-petition, represents nothing more than a measure of the damage claim that arose pre-petition in favor of TRW when the Debtor repudiated its purchase orders. However, that is just not what the documents themselves say.

The recitals in the Financing Order make it clear that the loan that the parties requested the Court to approve was a post-petition loan for working capital for all of the expenses incurred by the Debtor in its post-petition business operations. It says nothing about liquidating or measuring damages against the Debtor on account of any pre-petition claim for breach of contract. Similarly, the SPA refers to the Debtor's need to borrow from Citizen Bank to continue post-petition operations. It too says nothing about liquidating or otherwise measuring any damages that might have accrued in favor of TRW or any of the other Participating Customers on account of any pre-petition breach of their contracts by the Debtor. In asserting that the unpaid balance owing on the SPA is in substance a pre-petition claim for damages, TRW ignores the recitals and the terms and provisions of the very documents that it signed post-petition and the Financing Order that the Debtor, Citizens Bank and the Participating Customers all asked the Court to approve. The Financing Order itself, in

-30-

which TRW purchased the participation states, without qualification, that the loan made by Citizens Bank is a "post-petition" loan for which the Debtor requests Court approval under §§ 364(c)(1), (2) and (3). All of those sections of the Bankruptcy Code deal only with the Court's authority to authorize a debtor to obtain post-petition credit, and the priority to be given to that post-petition credit. None of those sections even permit a debtor to request the Court to adjudicate that a pre-petition damage claim for breach of contract by the debtor can somehow be elevated to and recognized by the Court as a post-petition extension of credit. TRW's position that the amount that it paid for its post-petition loan participation is somehow a pre-petition claim is not supported by § 364 of the Bankruptcy Code nor in any way by the terms and provisions of the Financing Order itself. Further, none of the declarations filed by TRW support TRW's after the fact attempt to recast the post-petition loan as a measurement of damages for a pre-petition breach of contract.

Moreover, TRW's recent adoption of this position is directly contradictory to the position that TRW has taken previously in this Court and that was addressed in In re Mayco Plastics, Inc., 379 B.R. 691 (Bankr. E.D. Mich. 2008). On August 10, 2007, the Debtor filed a second amended combined disclosure statement and plan in the Chapter 11 bankruptcy case. TRW objected to confirmation of the plan. On November 29, 2007, TRW filed a brief (docket entry #667 in the bankruptcy case) that set forth in detail its position regarding the unpaid balance owing to it on account of its purchase of the loan participation under the SPA. First, TRW stated in that brief that it was the holder of an administrative expense claim for the unpaid balance owing on the participation under § 503(b)(1) of the Bankruptcy Code. Second, TRW asserted that it was the holder of a super priority post-petition claim under § 364(c)(1) of the Bankruptcy Code. Relying on the post-petition nature of its claim under § 503(b)(1) and § 364(c)(1), TRW successfully blocked confirmation of the

Debtor's plan. In the concluding paragraphs of that brief, TRW urged the Court to follow the "old maxim" that "if it walks like a duck, quacks like a duck and looks like a duck, it must be a duck." (Docket entry #667 at p.9.) The "duck" that TRW urged the Court to recognize was the existence of a post-petition claim under § 503(b)(1) and § 364(c)(1).

The Court ultimately found that TRW did not hold a § 503(b)(1) claim, but not because it was pre-petition in nature. Rather, the Court found that TRW held a post-petition super priority claim under § 364(c)(1). In re Mayco Plastics, Inc., 379 B.R. at 707. Because this super priority post-petition claim was not paid in full by the Debtor's proposed plan, the Court sustained TRW's objection to confirmation at the confirmation hearing on January 11, 2008. Now that it perceives it expedient to do so, TRW reverses field and urges the Court to view the unpaid balance owing on the subordinated loan participation as really being pre-petition in nature and not a post-petition claim as it previously urged. The Court was persuaded by TRW's objection to confirmation of the Debtor's plan that TRW's claim was a post-petition super priority claim under § 364(c)(1). The Court remains so persuaded today, as nothing in the Financing Order, the SPA, TRW's declarations or briefs convinces the Court that the unpaid balance owing on TRW's subordinated loan participation in Citizens Bank's loan is anything other than a post-petition claim.

Because the unpaid balance owing by the Debtor on TRW's subordinated loan participation is a post-petition claim, any right of set off that might otherwise exist under state law is not preserved by or even addressed in § 553 of the Bankruptcy Code. Section 553 of the Bankruptcy Code only pertains to set off of pre-petition debts and pre-petition claims. Because TRW's claim against the Debtor is a post-petition claim, it is not covered by § 553 and § 553 does not permit TRW to set it

-32-

off against the pre-petition debt owing by TRW to the Debtor.[1]

>    6.    Even if not preserved by § 553, does TRW have the right to set off the unpaid balance owing on its post-petition loan participation against the pre-petition payable that it owes the Debtor?

TRW concedes that § 553 is not applicable if the Court determines that TRW's claim against the Debtor is a post-petition claim. However, in its post hearing brief, TRW asserts that even if the Court finds, as it has done in this opinion, that the unpaid balance owing to TRW under the SPA is a post-petition claim, TRW still has a right to set it off against the pre-petition payable that it owes to the Debtor. If § 553 does not apply, the question then becomes what law governs whether TRW may set off its post-petition claim against the pre-petition debt that it owes to the Debtor.

The Bankruptcy Code does not create any federal right of set off but instead only preserves set off rights that otherwise exist under non-bankruptcy federal or state law. Citizens Bank of Maryland v. Strumpf, 516 U.S. 16 (1995). As noted above, Michigan law recognizes a right of set off. In re New Haven Foundry, Inc., 285 B.R. 646, 647-48 (Bankr. E.D. Mich. 2002). Under Michigan law, setoff is an equitable remedy. "In general, absent a statutory mandate authorizing a setoff in a particular circumstance, setoff is a matter in equity." Walker v. Farmers Insurance Exchange, 572 N.W.2d 17, 19 (Mich. Ct. App. 1997) (citation omitted). In Michigan, a set off requires a mutuality of debt between the same real parties in interest. In re New Haven Foundry, 285 B.R. at 648. Generally, "mutuality requires that the debts be owed between the same parties acting in the same capacity . . . ." Id. (citation omitted). "[T]he essence of mutuality is that, at the time of

---

[1] The Debtor and TRW each addressed in their briefs various subsections of § 553 and argued over the effect of such subsections on this case. However, because § 553 only applies to setoffs of pre-petition debts and pre-petition claims, and because the Court finds that TRW's claim for the unpaid balance owing on its participation is a post-petition claim, the Court need not address the parties' arguments regarding the effect of those other subsections of § 553.

setoff, each party owns its claim independently 'with the right to collect in [its] own name against the debtor in [its] own right and severally.'" U.S. Aeroteam, Inc. v. Delphi Automotive Systems, LLC (In re U.S. Aeroteam, Inc.), 327 B.R. 852, 865 (Bankr. S.D. Ohio 2005) (quoting Braniff Airways, Inc. v. Exxon Co., U.S.A. 814 F.2d 1030, 1036 (5th Cir. 1987)).

To determine whether mutuality is present in this case first requires identifying the parties that hold the debt and the claim at issue. It is not disputed that TRW owed the pre-petition debt to the Debtor. Moreover, the unpaid balance of the post-petition loan is undoubtedly a claim against the Debtor.[2] However, as explained above, it was Citizens Bank that actually made the post-petition loan to the Debtor as the "Lender" under the Financing Order. The Financing Order and the SPA define TRW's relationship to the post-petition loan as that of a participation. Does that make TRW the holder of a claim against the Debtor?

In Bayer Corp. v. MascoTech, Inc. (In re Auto Style Plastics, Inc.), 269 F.3d 726 (6th Cir. 2001), the Sixth Circuit Court of Appeals explained what a participation is.

> A participation is not a loan. To the contrary, a participation is a contractual arrangement between a lender and a third party whereby the third party, labeled a participant, provides funds to the lender . . . . The lender, in turn, uses the funds from the participant to make loans to the borrower. The participant is not a lender to the borrower and has no contractual relationship with the borrower. The participant's only contractual relationship is with the lender; the participant has no ability to seek legal recourse against the borrower.

269 F.3d at 736 (internal quotation marks and citations omitted). The Autostyle court then adopted

---

[2] Section 101(5) of the Bankruptcy Code defines "claim" as a "(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured."

-34-

a four part definition of a "true" participation agreement:

(1) money is advanced by a participant to a lead lender;
(2) the participant's right to repayment only arises when the lead lender is paid;
(3) only the lead lender can seek legal recourse against the borrower; and
(4) the document is evidence of the parties' true intentions.

Id. at 736-37 (citing In re Coronet Capital Co., 142 B.R. 78, 82 (Bankr. S.D.N.Y. 1992)). The panel concluded that "[w]e believe that this definition accurately describes the factors that must be considered in order to determine if the parties have, in fact, entered into a participation agreement or another type of transaction simply labeled a participation agreement." Id. at 737.

In this case, TRW advanced funds under the SPA to Citizens Bank as the lead lender under the Financing Order. Paragraph 7 of the SPA makes it clear that TRW's right to repayment only arises once Citizens Bank has been paid in full. Paragraph 7 of the SPA also makes it clear that TRW had no right to enforce any of the loan documents and seek legal recourse against the Debtor until Citizens Bank had been paid in full. The declarations filed by TRW do not in any way contradict the recitals in the Financing Order and the SPA, all of which show that the intentions of TRW and Citizens Bank were to create a participation by TRW in Citizens Bank's post-petition loan to the Debtor. There is no question that the SPA meets the four part test of Autostyle. Therefore, when the parties entered into the SPA and TRW advanced funds to Citizens Bank, TRW was not the holder of a claim against the Debtor but instead was only a participant in Citizens Bank's loan. Instead, the claim was held by Citizens Bank. "The courts are generally in agreement that a transfer of an undivided interest and participation on the context of a true participation does not allow the participant to assert a claim against the borrower." In re Okura & Co. (America), Inc., 249 B.R. 596, 608-09 (Bankr. S.D.N.Y. 2000) (collecting cases). As a result, there was no mutuality between the Debtor and TRW at the time that TRW advanced funds under the SPA because TRW did not hold

a claim against the Debtor at that time.

However, TRW asserts that notwithstanding the fact that it was originally only a participant in the Citizens Bank loan under the SPA, it is now itself the holder of a claim against the Debtor by reason of an assignment that it has subsequently taken from BBK. "[A]n assignment of rights can create mutuality for set off purposes." U.S. Aeroteam, Inc. v. Delphi Automotive Systems, LLC (In re U.S. Aeroteam, Inc.), 327 B.R. 852, 865 (Bankr. S.D. Ohio 2005); New Haven Foundry, Inc., 285 B.R. at 648. The SPA provides in paragraph 7 that once Citizens Bank has been paid in full then, at its option, Citizens Bank may assign the "Loan Documents . . . and all rights thereunder to BBK as agent for the Participating Customers . . . ." The SPA contains no provision either authorizing or prohibiting BBK from further assigning any rights under the "Loan Documents" to any or all of the Participating Customers. According to TRW's post hearing brief (docket entry #123) Citizens Bank executed an assignment to BBK on November 30, 2007, and BBK thereafter executed an assignment to TRW on the same day. A copy of the assignment from BBK to TRW is attached to TRW's post hearing brief. Paragraph 2 of the assignment provides that BBK "hereby assigns to each of the Participating Customers the following stated percentages of the Claims." TRW is listed as receiving 31.1% of the "Claims." TRW concludes that it is now the holder of a claim because of the assignment and, therefore, the required mutuality is present.

However, even if the Court agrees with TRW that it now holds a claim by reason of the BBK assignment, there are a number of courts that have held that mutuality does not exist where one of the obligations sought to be set off arose pre-petition and the other arose post-petition, even if the holder of the claim against the debtor is the same party indebted to the debtor.

In Chapter 11 bankruptcy, the debtor files a petition for bankruptcy, becomes a debtor-in-possession, and thus succeeds to a set of statutorily defined powers and

duties.  The debtor-in-possession is considered to be a separate legal entity from the debtor himself.  Since the debtor and debtor-in-possession are separate legal persons, there is no mutuality between a creditor's pre-petition claim against a debtor and a debtor-in-possession's post-petition claim against a creditor.

Gordon Sel-Way, Inc. v. United States (In re Gordon Sel-Way, Inc.), 270 F.3d 280, 290 (6th Cir. 2001) (citation omitted); see also In re Braniff Airways, Inc., 42 B.R. 443, 449 (Bankr. N.D. Tex. 1984) ("[A]s a general rule, neither a creditor nor a debtor may offset pre-petition debts and claims against post-petition debts and claims because of the absence of mutuality of the parties.  A *debtor's* pre-petition claim against a creditor does not involve the same parties as the *debtor-in-possession's* claim against the same creditor.").

TRW counters that mutuality does exist even if its claim is post-petition and its debt is pre-petition.  In support, TRW points to National Labor Relations Board v. Bildisco and Bildisco, 465 U.S. 513 (1984) and the Supreme Court's statement in that opinion that "it is sensible to view the debtor-in-possession as the same 'entity' which existed before the filing of the bankruptcy petition . . . ."  Id. at 528.  The difficulty with TRW's reliance upon Bildisco is that the Supreme Court made the statement in that case in the context of addressing the rights and responsibilities of a debtor-in-possession under a collective bargaining agreement.  The Court acknowledged that fact by prefacing the quote selected by TRW by saying "[f]or our purposes . . . ."  Id.  The purposes of the Court in that case were unique to the collective bargaining relationship and do not have application to the body of law governing set off.  Further, the statements made by the Sixth Circuit Court of Appeals in In re Gordon Sel-Way, Inc. regarding the distinction between the debtor and the debtor-in-possession were made in the factually apposite context of a set off and were made long after the Bildisco case was decided.

TRW also relies upon In re Express Parts Warehouse, Inc., 230 B.R. 526 (Bankr. E.D.N.C.

1999). The court in that case addressed equitable considerations in allowing a creditor to set off his pre-petition debt to the debtor against the debtor's post-petition obligations to the creditor. In round numbers, the creditor held both a $40,000 pre-petition claim under a consulting contract as well as a $160,000 post-petition claim for rent and miscellaneous charges under a lease for non-residential real property. 230 B.R. at 527-28. The creditor also owed the debtor $280,000 under a promissory note. Id. at 528. As a defense to the creditor's insistence on payment of post-petition obligations under the lease, the debtor had consistently claimed that it was offsetting those obligations against the creditor's obligations under the promissory note. In doing so, the debtor had avoided payments it was obligated to make under § 365(d)(3) of the Bankruptcy Code. Absent those payments, the creditor had a right to immediate possession of the property. The creditor sought to set off the post-petition unpaid rent against his pre-petition promissory note obligations.

The court permitted the set off. Its holding, however, was not premised upon any finding of mutuality. Instead, in overruling the debtor's objections, the court found that "it would be inequitable to preclude setoff in the circumstances of this case." Id. The debtor "derived a significant benefit from its assertions that it was offsetting its obligations to pay postpetition rent against the promissory note, and it would be inequitable to deny setoff to [the creditor] at this stage of the case." Id. at 528-29. "The court relied on [the debtor's] representations and extended the time for the debtor in possession to assume or reject leases." Id. at 529. "If the court had not believed that the post-petition rent was current, it would have denied the debtor's request to extend the time to assume or reject leases and may have modified the automatic stay to permit [the creditor] to regain possession of his property." Id.

The Express Parts case was decided based upon equitable considerations unique to that case.

-38-

But it does not contradict or even address the mutuality requirement for set off under Michigan law or under In re Gordon Sel-Way, 270 F.3d 280, 290-91. In the case before the Court, TRW owed a pre-petition debt to the Debtor. Citizens Bank made a post-petition loan to a debtor-in-possession under the Financing Order and TRW purchased a participation in that post-petition loan under the SPA. Even though TRW now holds a claim against the Debtor by reason of the BBK assignment, it is a post-petition claim. The pre-petition debt and the post-petition claim are not debts between the same parties acting in the same capacity. Therefore, under In re Gordon Sel-Way, there is no mutuality.

Even if the Court were to conclude that mutuality is present, In re Gordon Sel-Way, Inc. permits the Court to examine equitable considerations in determining whether to apply the equitable remedy of setoff. The Sixth Circuit Court of Appeals explained that "[o]nce the prerequisites for establishing a setoff claim are established, the court generally looks to the equities in order to determine if the setoff should be allowed." Id. at 292 (citation omitted).

There are a number of equitable considerations that persuade the Court that TRW should not be permitted to set off its post-petition claim even if the Court were to find mutuality.

First, TRW only became a holder of a claim against the Debtor on November 30, 2007. Until then, as explained above, TRW was a participant in a loan, not a claimant against the Debtor. TRW became the holder of a claim long after TRW's pre-petition debt became due, the Debtor filed its Chapter 11 petition, and the Debtor, Citizens Bank and the Participating Customers requested the approval of the Financing Order. Moreover, it was also long after this lawsuit was filed. The Debtor filed its adversary complaint against TRW on May 14, 2007. TRW took an assignment of a post-petition claim from BBK on November 30, 2007. The assignment does not state that TRW paid any

-39-

consideration for the assignment at that time. Nor does it provide any information for why the assignment was made at that time. However, the execution of the assignment at that time clearly enabled TRW to improve its position in defending the lawsuit brought by the Debtor against it to collect a pre-petition payable owed to the Debtor by TRW. TRW did not provide the Court with any reason why it took the assignment on November 30, 2007, other than to improve its position in this litigation and to enhance its rights relative to the rights of all of the other creditors of this estate.

Second, TRW has previously represented to the Court that the Debtor has not and cannot pay its § 364(c)(1) super priority claim. Relying on that factual premise, TRW successfully objected to confirmation of the Debtor's second amended combined disclosure statement and plan. TRW used this argument to successfully defeat confirmation of that plan. Having defeated the Debtor's plan, with the assertion that the Debtor has not and cannot pay the unpaid balance of TRW's participation, it seems disingenuous for TRW to now tell the Court that the unpaid balance of its participation can and should be paid in full by setting it off against the pre-petition debt owed by TRW to the Debtor.

Third, the manner in which the post-petition loan was described to the Court and the creditors did not adequately inform creditors that TRW, although only a participant in the loan, might subsequently take an assignment of a fractional share of a claim from Citizens Bank or BBK for the purpose of creating a right to set off the amount it owed on its pre-petition debt to the Debtor. When the transaction was described in open court and in the papers filed requesting the entry of the Financing Order, there was an extensive description of the security to be given to Citizens Bank for repayment of the loan under § 364(c)(2) and (3) and the super priority to be given to payment of the loan under § 364(c)(1). But there was no mention of the possibility that TRW could refuse to pay its pre-petition debt to the Debtor, which was already due and payable at that time for goods

purchased and accepted by TRW, and apply it to the payment of the post-petition loan being made by Citizens Bank to the Debtor. Nor was it explained that Citizens Bank's claim could later be carved up and fractional shares assigned, to be used to set off pre-petition payables owed to the Debtor. Had this been disclosed to creditors and the Court, creditors may well have objected to the granting of the request for such extensive collateral and for super-priority for the payment of Citizens Bank's loan. If it had been disclosed that the post-petition loan authorized under § 364 could be paid not only on the terms described in the Financing Order, but also by TRW simply refusing to pay for goods it had already accepted, and thus claiming a right of set off of its pre-petition payable, creditors may well have objected and the Court may well have declined to approve the Financing Order on the terms described in it.

Fourth, TRW's post-petition claim arose out of a loan made largely for the benefit of the Participating Customers, including TRW. The post-petition loan enabled them to keep a steady supply of product post-petition until they could either arrange for a new supplier or until the Debtor's business could be sold as a going concern. This was not a loan that provided the basis for a plan of reorganization to benefit all creditors. It was a loan made to get to a § 363 sale to benefit the Participating Customers and secured creditors of the estate. That does not make it improper, but does make it inequitable to then also permit TRW to set off the pre-petition payable that it owes the Debtor against the unpaid balance of this post-petition loan.

Fifth, TRW did not just make a post-petition loan to the Debtor. Instead, it entered into a participation with Citizens Bank. It chose to do so voluntarily, presumably for rational business reasons. TRW gained benefits by structuring its advancement of funds via the participation with Citizens Bank. It gained the benefit of Citizens Bank's security interest, priority and administration

of the loan. It obtained an inventory bank of parts, a tooling acknowledgment, a seven day right to

resource its business, and an Access and Security Agreement. The loan by Citizens Bank enabled

the Debtor to continue to operate and provide an uninterrupted supply of parts to TRW until a § 363

sale could be conducted. The sale was held and there was no interruption in the Debtor's business

post-petition. TRW received the benefit of the bargain it struck with Citizens Bank. However, by

choosing to structure its involvement in the manner in which it did, and by bargaining for the

protections of a loan participation rather than a direct loan to the Debtor, TRW deliberately left itself

without a direct right to payment. In other words, TRW did not have a claim against the Debtor until

after Citizens Bank was paid in full.

Sixth, § 553(a)(2)(A) bars the creditor from setting off a mutual debt owing by such creditor

to the Debtor against a claim transferred to such creditor where the claim was transferred to the

creditor "after the commencement of the case."[3] While § 553 does not apply to TRW's claim because

it is a post-petition claim, the policy behind § 553(a)(2)(A) would seem to have application to the

transfer of any claim to a creditor "after the commencement of the case" regardless of whether the

transferred claim was a pre-petition claim or a post-petition claim against the Debtor. The purpose

for that bar is no mystery. "The provision was enacted to prevent creditors from trafficking in claims

immediately pre-or post-petition to create a setoff advantage in bankruptcy." U.S. Aeroteam, Inc.

v. Delphi Automotive Systems, LLC (In re U.S. Aeroteam, Inc.), 327 B.R. 852, 867 n.13 (Bankr. S.D.

Ohio 2005) (citation omitted). If a creditor cannot traffic in claims to gain set off rights against a

---

[3] If the Court had accepted TRW's contention that the amount owing to it on the SPA is really a pre-petition claim, then § 553(a)(2)(A) would apply to bar TRW from setting off this pre-petition claim against TRW's pre-petition payable because it was not until November 30, 2007, long after the Debtor's petition was filed, that TRW took an assignment of the claim from BBK.

debtor where the claim being purchased is pre-petition in nature, why should a creditor be entitled to traffic in claims to obtain a set off just because the claim being purchased is post-petition in nature? The policy behind § 553(a)(2)(A), although made statutorily applicable only to a post-petition transfer of a pre-petition claim, appears sound and equally beneficial when applied to a post-petition transfer of a post-petition claim. In this case, TRW took its assignment of a claim on November 30, 2007, long after the commencement of the bankruptcy case, the entry of the Financing Order and the commencement of this adversary proceeding, for no apparent purpose other than to buttress its assertion of a right of set off. To permit it to do so would encourage rather than discourage the trafficking in claims against a debtor.[4]

Finally, prohibiting TRW from implementing a set off in this case is not inconsistent with the equitable policy considerations on which the equitable doctrine of set off is based. "The right of setoff . . . allows entities that owe each other money to apply their mutual debts against each other, thereby avoiding the absurdity of making A pay B when B owes A." <u>Citizens Bank of Maryland</u>

---

[4] TRW argued that the policy against claim trafficking is not applicable in this case. According to TRW, if it had not purchased a subordinated participation, then its supply of parts would have been interrupted, causing it to be in breach of its own contracts with upstream manufacturers. TRW reasons that its duty to mitigate damages and avoid its own breach meant that it had a "direct legal obligation" to purchase the subordinated participation. In light of that independent obligation, TRW concludes that its purchase was not the transfer of a claim within the meaning of § 553(a)(2). This argument misses the point.

First, there is no evidence of TRW having any legal obligation to purchase a subordinated participation. To the contrary, the SPA provides that "[t]he Participating Customers [ ] acknowledge that the Participations are being made at their request . . . ." (Docket entry #98, Ex. 6.) Second, the "claim trafficking" in this case occurred upon BBK's November 30, 2007, assignment of a fractional interest in Citizens Bank's claim to TRW. TRW does not try to connect that transaction with its duty to mitigate damages or fulfill its obligations to its customers. Moreover, TRW points to no evidence that it had a direct legal obligation to take the assignment from BBK.

v. Strumpf, 516 U.S. 16, 18 (1995) (quotation marks and citation omitted). This case simply does not present the "absurdity of making A pay B when B owes A." Instead, what happened here is that TRW owed the Debtor substantial sums pre-petition for parts and tooling it had purchased. TRW then determined to purchase a participation in a post-petition loan in exchange for various benefits that it bargained for and received. The "absurdity" sought to be avoided by the equitable doctrine of set off and preserved in § 553 regarding pre-petition debts and pre-petition claims is not present on these facts where the Debtor no longer has funds to pay the post-petition loan approved by the Financing Order and TRW takes an assignment of a share of that claim already knowing full well that the Debtor cannot pay it. There is nothing "absurd" or "inequitable" about now denying TRW the right to set off the post-petition claim it now holds and that was assigned to it long after the bankruptcy case was filed and this adversary proceeding was brought against TRW.

In sum, the Court holds that there was no mutuality between the pre-petition debt owed by TRW and the post-petition claim of Citizens Bank under the Financing Order when TRW purchased a participation in it under the SPA. Further, the Court holds that the subsequent assignment of a portion of the post-petition claim by Citizens Bank to BBK and thereafter by BBK to TRW, after this lawsuit was filed, does not establish mutuality sufficient to entitle TRW to set off the unpaid balance owing with respect to this claim.[5] Finally, even if the post-petition assignment of this claim does establish mutuality, the Court concludes that in the exercise of its sound discretion, it will not permit set off because it would be inequitable to do so based on the circumstances of this case.

_____

[5] The Debtor also challenged TRW's right to unilaterally assert claims under the SPA in light of the assignment from BBK being to multiple parties without the consent of the Debtor as the obligor and without joining the other Participating Customers as parties to this adversary proceeding. The Court determines that it need not reach this issue.

-44-

## VI.  Conclusion

For the reasons stated in this opinion, the Debtor's motion for partial summary judgment is granted in part and denied in part, and TRW's motion for partial summary judgment is granted in part and denied in part.  The Court will enter a separate order consistent with this opinion.

**For publication**

**Signed on May 02, 2008**

                                          /s/ Phillip J. Shefferly
                                    Phillip J. Shefferly
                                    United States Bankruptcy Judge